[No. 24267. Department One. February 14, 1933.]

EUGENE STACK, *Appellant*, v. R. H. BAIRD *et al.*,
*Respondents.*[1]

*Chadwick & Chadwick* and *F. A. LeSourd,* for appellant.

*Smith, Matthews & Dunn* and *Elmer Goering,* for respondents.

[1]Reported in 19 P. (2d) 105.

MILLARD, J.—On December 2, 1930, R. H. Baird entered into a contract with King county to raze the old King county court house. Under a written agreement of December 9, 1930, Baird sold all of the steel and iron in that building to Eugene Stack for a consideration of $775. Stack agreed to remove the material purchased by him, "as and when it is exposed in the walls and floors of the building by the seller in the course of his wrecking operations." From December 9, 1930, to January 2, 1931, Stack removed approximately eight tons of I beams and other steel from the building.

On or about December 15, 1930, Thomas J. Kesterson entered into a contract with Baird to complete the wrecking of the building. Under that contract, Baird reserved the right to "dispose of all parts and salvage arising from said building."

On December 26, 1930, Stack entered into an agreement with a certain company in Seattle to sell to it, at $17.50 a ton, all of the steel I beams removed from the old court house. The buyer imposed the condition, "that any steel that does not pass our inspection will be returned to you at your expense." That company accepted, and paid the price stipulated for, the eight tons of I beams removed from the old building by Stack.

Despite the written protest of Stack to Baird on January 2, 1931, and subsequent oral complaints by Stack to Baird and Kesterson, the latter failed to comply with the contractual provision "to expose the steel in the walls and floors of the building in the course of his wrecking operations." Stack took his men off of the job and did not remove any more steel after January 2, 1931. Kesterson pulled down the walls above the second story, dynamited the cupola,

which left the two-story shell standing with the steel I beams bent and in a tangled mass. By means of a steam shovel, Kesterson leveled the two stories and carried away the debris. The bent and twisted steel beams lying on the ground had no value—Stack's purchaser refused to accept delivery of the beams because of their bent condition—other than as junk, and were sold by Kesterson to one Piedmont for a consideration of one dollar. Stack was employed by Piedmont to remove the steel from the debris and to cut it up as scrap and sell it for him on a cost-plus basis.

An action was instituted by Stack against the marital community of R. H. Baird and wife for return of the purchase price of $775 paid by the plaintiff to the defendants for the steel, and for recovery of net profit of $853 which would reasonably have been earned by plaintiff upon sale of the remaining materials contained in the building but for the destruction of the value thereof. While the trial of the cause to the court resulted in a finding that the defendants breached the contract in that they did not expose the beams in place in the floors and walls, the court also found that the evidence on behalf of the plaintiff "as to damages sustained was speculative, indefinite and uncertain, both as to the cause and amount thereof." Judgment of dismissal was entered. Plaintiff has appealed.

Appellant was not entitled to recover for loss of profits which he insists would have accrued from a resale of the I beams to a company in Seattle which had agreed to purchase all of the steel removed from the old building. The matter of prospective profits on that agreement was not in the contemplation of appellant and respondents at the time they entered into their contract. Respondents did not know until subsequent to their assignment to Kesterson of the con-

tract for wrecking the old court house that appellant was negotiating with any one for resale of the steel.

The company with which appellant had his contract for resale of the steel reserved the right to reject any beams that were not entirely to the satisfaction of that company. Its representative testified that the steel in the building was not inspected prior to the wrecking of the building; that, after the building was wrecked, the company would not accept any of the beams.

"Q. Under your agreement with Mr. Stack you could reject any beam that you wanted to and your own reason was to be sufficient? A. Yes. Q. And you might reject it because it had cement on it or because it had pick marks on it, or because it had pits on it, or because it was too short? A. Yes."

It was conjectural how much steel the company with which appellant had his contract would have accepted. There was no certainty that the company would have accepted, if same had been offered, any more than the eight tons already accepted and for which payment had been made. It is pure speculation how much steel the company would have accepted.

"The plaintiff's right to recover for such a loss depends on his proving with sufficient certainty that such advantages would have resulted, and, therefore, that the act complained of prevented them." 1 Sutherland on Damages (2d Ed.), § 59.

■ Appellant did not sustain the burden of proof of damages based upon the difference in the market value of the steel in the building prior and subsequent to the breach of the contract. One witness, who knew nothing of the condition of the beams of the building prior to the time the building was wrecked, visited the site after the destruction of the building, and on the basis of that inspection, and the price at which he had

sold steel from other buildings, testified as to the market value of the beams lying in the wreckage. The trial court, which was in a better position than we to weigh the evidence, manifested disbelief of the testimony as to the market value of the beams. Another witness, a representative of the company with which appellant had a contract for purchase of the beams when removed from the building, testified that he did not inspect the steel prior to the time the building was wrecked. This witness did not know what the condition of the steel was prior to the time he saw it in a tangled mass. This is the same witness who testified that the steel would be rejected by his company if it did not conform to certain specifications. While the steel beams were of value only as junk after the building was dynamited, there was no evidence of market value of the beams prior to that time.

Appellant should have been awarded, as he contends, recovery of the amount of the purchase price paid to respondents for the steel less the value of the eight tons of beams removed by him. The purchase price of $775 was fixed on the value of the I beams. Eight tons of steel were removed by the appellant under his contract with respondents. There was evidence from which it appears one hundred and sixteen tons of steel were left in the building; that is, there were one hundred and twenty-four tons of steel for which appellant paid $775, or $6.25 a ton.

The contract was one to sell specific goods to the appellant, and the respondents were bound to do something to the goods for the purpose of putting them into a deliverable state. The appellant was not to take delivery until the respondents, in the course of their wrecking operations, exposed the steel in the walls and floors of the building to enable the appellant purchaser to remove the steel. Under the contract, the respond-

ents (the sellers) were bound to expose the steel in the walls and floors of the building. That was an act to be performed by the respondents to put the steel in a deliverable state. The title to the eight tons of steel removed by the appellant passed to the appellant. A different intention not appearing, the property in one hundred and sixteen tons of steel which were not put in a deliverable state by the respondents, as required by the contract, did not pass to the appellant.

"(1) Where there is a contract to sell specific or ascertained goods, the property in them is transferred to the buyer at such time as the parties to the contract intend it to be transferred.

"(2) For the purpose of ascertaining the intention of the parties, regard shall be had to the terms of the contract, the conduct of the parties, usages of trade and the circumstances of the case." Rem. Rev. Stat., § 5836-18.

"Unless a different intention appears, the following are rules for ascertaining the intention of the parties as to the time at which the property in the goods is to pass to the buyer: . . .

"Rule 2. Where there is a contract to sell specific goods and the seller is bound to do something to the goods for the purpose of putting them into a deliverable state, the property does not pass until such thing be done." Rem. Rev. Stat., § 5836-19.

One hundred and sixteen tons of the steel, for which appellant paid at the rate of $6.25 a ton, were not delivered to him. The consideration for the payment failed, therefore appellant was entitled to recover the money paid by him to the respondents. Rem. Rev. Stat., § 5836-70.

In *American National Bank v. National Bank of Commerce*, 132 Wash. 490, 232 Pac. 295, the purchaser deposited a draft in escrow to pay for the goods ordered. Only part of the goods were delivered. We

held that the purchaser could recover an amount equal to the price of the goods not delivered. The pertinent portion of the opinion reads as follows:

"He should pay for those received, but there is no reason why he should pay for the goods that were never sent. He did not, because of the acceptance of a portion of the goods, become liable for the portion never shipped. That was not his agreement with the appellant and is not one which can be enforced by the law, under the facts. By his action in receiving part of the goods, he did not relegate himself only to an action of damages against the body company; and even though he might be held to have done so, in such a suit he would only be compelled to pay the value of the goods which he actually received, and in this action he should be compelled to do the same and no more."

Appellant's right to recover the money paid by him for goods which were not delivered is not affected by his transaction with Piedmont. The property in one hundred and sixteen tons of steel did not pass to appellant, as stated above. The title to that steel was in Baird or in his sub-contractor, Kesterson. After the building was razed, Kesterson was advised by his attorney that the steel had to be removed from the building site. Kesterson testified:

"Q. Mr. Kesterson, those beams were in your way there? A. Yes. Q. How did you happen to sell those beams to Mr. Piedmont? A. Mr. Stack told me he wasn't going to remove them, so I consulted my attorney and he said, 'Get rid of them, anyway, get them out of the way, because you have to clear the property,' and a man by the name of Piedmont offered to take them away. I sold them to him for one dollar."

That is, Kesterson, by his sale of the steel to Piedmont for one dollar, relieved himself of the expense of taking the steel from the premises. That appellant was employed by Piedmont to remove the steel from

the debris 'and to cut it up as scrap and sell it for Piedmont on a cost-plus basis, does not show fraud or bad faith on the part of appellant.

The judgment is reversed, and the cause remanded with direction to the superior court to enter judgment in harmony with the views herein expressed.

BEALS, C. J., PARKER, MITCHELL, and HOLCOMB, JJ., concur.